UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| TAMMY LYNN ANDERSON, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> NANCY A. BERRYHILL,[1] ) <br> Acting Commissioner of Social Security, ) <br> ) <br> Defendant. ) <br> ) | Case No. 4:15-CV-1557 JAR |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Tammy Lynn Anderson's ("Anderson") applications for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq. and supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq.

**I.      Background**

On September 26, 2012, Anderson protectively filed applications for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq. (Tr. 157-161), and for SSI benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. (Tr. 162-169), alleging disability due to arthritis, carpal tunnel syndrome, tendonitis, bipolar disorder, and neck, back, hip, knee, and hand pain (Tr. 188). Anderson initially alleged disability beginning September 15, 2002, but later amended her alleged disability onset date to May 11, 2012 (Tr. 157, 162, 183).

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

The Social Security Administration ("SSA") denied Anderson's claims on December 21, 2012 (Tr. 61-85). Anderson filed a timely request for a hearing before an administrative law judge ("ALJ") (Tr. 104-108). After a hearing held on March 20, 2014 (Tr. 45-60), the ALJ issued a written decision on May 21, 2014, upholding the denial of benefits (Tr. 22-44). Anderson requested review of the ALJ's decision by the Appeals Council (Tr. 16-18). On August 7, 2015, the Appeals Council denied her request for review (Tr. 1-7). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See Sims v. Apfel, 530 U.S. 103, 107 (2000).

Anderson filed this appeal on October 9, 2015 (Doc. 1). The Commissioner filed an Answer (Doc. 11). Anderson filed a Brief in Support of her Complaint (Doc. 14), the Commissioner filed a Brief in Support of the Answer (Doc. 24), and Anderson filed a Reply Brief (Doc. 25).

## II. Decision of the ALJ

The ALJ determined that Anderson met the insured status requirements of the Social Security Act through March 31, 2016, and had not engaged in substantial gainful employment since May 11, 2012, the alleged onset date of disability (Tr. 25, 27). The ALJ determined that Anderson had the following severe impairments: migraine headaches, diffuse arthralgias, residuals of left ulnar nerve transposition, degenerative changes of the cervical and lumbar spine, degenerative changes of the knees, early osteoarthritis of the thumbs, and a personality disorder (Tr. 28). The ALJ further found that no impairment or combination of impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 28-30).

After considering the entire record, the ALJ determined that Anderson had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and

416.967(b), with the following additional limitations: can never climb ropes, ladders, or scaffolds; can occasionally climb stairs and ramps; can occasionally stoop, kneel, and crouch; can occasionally use the left upper extremity for handling or gross manipulation; and must avoid concentrated exposure to unprotected heights and vibration (Tr. 30). The ALJ further noted that Anderson is able to understand, remember, and carry out at least simple instructions and perform non-detailed tasks (Id.).

The ALJ found that Anderson had no past relevant work which rose to the level of substantial gainful activity; however, based on her age, education, and RFC, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Anderson can perform, including furniture rental consultant and school bus monitor (Tr. 37-38). Thus, the ALJ concluded that Anderson had not been under a disability from the amended alleged onset date of May 11, 2012 through the date of his decision, May 21, 2014 (Tr. 38).

### III.  Administrative Record

The following is a summary of the relevant evidence before the ALJ.

#### A.  Hearing Testimony

The ALJ held a hearing in this matter on March 20, 2014. The ALJ heard testimony from Anderson and Delores Gonzalez, a vocational expert.

##### 1.  Anderson's testimony

Anderson was 47 years old at the time of the hearing (Tr. 47). She completed high school and attended beauty school (Id.). She testified that she has never worked full-time (Tr. 48). It was Anderson's testimony that she suffers from neck, head, lower back, knee, wrist, and shoulder pain (Tr. 49, 54). She had recently been evaluated by an orthopedic specialist and a rheumatologist (Id.). She had also undergone injections in her thumbs, but they helped only for a

couple of weeks (Tr. 49, 55). She also had injections in her shoulder, which provided relief for two weeks; injections in her left elbow, which helped for a month and a half; and injections in her sacroiliac joint, which helped for approximately a week before exacerbating her pain (Tr. 56). On November 15, 2013, she had surgery on her left elbow to treat numbness in her fingers (Tr. 49-50, 52-53). Anderson testified that the surgery helped with the numbness in her left hand, but that she still experiences tingling and an intense, achy pain in both hands due to carpal tunnel syndrome (Tr. 50-53). When she sits, Anderson experiences neck, back, and sometimes shoulder pain (Tr. 54). According to Anderson, she can only sit for 30 to 45 minutes at a time because of her back, neck, and shoulder pain; after that, she needs to stand up and move around for 5 to 10 minutes before she can sit again (Id.). If she stands longer than 30 minutes, she feels pain in her lower back and knee; she then needs to put her leg up on a stool to take the pressure off of her back (Tr. 55).

Anderson explained that she gets migraines two to three times per week for eight to ten hours at a time (Id.). She takes medication for her migraines, and it helps sometimes (Tr. 51). Anderson also testified that she suffers from knee pain, that she has had injections in both her knees, and that she has swelling in her left knee. She has also had fluid removed from each knee (Tr. 51). Anderson testified that she has been fired from several jobs because her migraines caused her to miss work too frequently (Tr. 53-54).

Anderson further testified that she has a psychological problem that affects her ability to concentrate, her ability to make decisions, and her ability to deal with problems (Tr. 52). Anderson has abused alcohol in the past, but had not consumed alcohol since November 2011 (Id.).

**2. Testimony of Vocational Expert**

For the first hypothetical, the ALJ asked vocational expert, Delores Gonzalez, to assume an individual of Anderson's age, education, and work history with the following limitations: lift and carry 20 pounds occasionally and 10 pounds frequently; stand or walk 6 out of 8 hours; sit for 6 out of 8 hours; occasionally climb stairs and ramps; never climb ropes, ladders or scaffolds; occasional handling and gross manipulation; avoid concentrated exposure to unprotected heights and vibrations; and able to carry out at least simple instructions and non-detailed tasks (Tr. 57). Ms. Gonzalez opined that such an individual would be able to work as a furniture rental associate, Dictionary of Occupational Titles ("DOT") No. 295.357-018, rated as light, unskilled and SVP 2, with 840 such jobs available locally and 50,808 nationally (Id.). Ms. Gonzalez further opined that such an individual would be able to work as a callout operator, DOT No. 237.367-014, rated as sedentary and unskilled, with 77 such jobs locally and 8,316 nationally (Tr. 58). She also opined that such an individual could work as a school bus monitor, DOT No. 372.667-042, rated as light, unskilled and SVP 2, with 840 jobs locally and 74,470 nationally (Id.).

For the second hypothetical, the ALJ added a sit/stand limitation, such that the person could "manage positions every 30 minutes," but must be able to sit, stand or walk for a total of 8 hours per workday (Tr. 58). Ms. Gonzalez opined that such an individual would still be able to work as a furniture rental consultant or school bus monitor (Id.). For the third hypothetical, the ALJ asked Ms. Gonzalez to assume the same limitations as the first hypothetical but with the added limitations that the person could lift 10 pounds occasionally, less than 10 pounds frequently, stand or walk 2 out of 8 hours, and sit for 6 out of 8 hours (Id.). Ms. Gonzalez opined that such an individual could work as a callout operator, or as an addresser, DOT No. 209.587-

010, rated as sedentary, unskilled, and SVP 2, with 214 such jobs locally and 8,904 nationally (Tr.58-59).

Anderson's counsel then asked whether an employer would tolerate the hypothetical person taking unscheduled breaks, due to her pain, such that she would be off task 20 percent of an 8-hour workday; Ms. Gonzalez responded that such breaks would likely not be tolerated and such a person would have trouble maintaining competitive employment (Tr. 59). Counsel then asked whether any of the jobs she had proposed would tolerate a person consistently missing three workdays per month. Ms. Gonzalez responded in the negative, opining that two or more days of missed work per month would be reason for termination (Id.)

### B. Medical Records

The ALJ summarized Anderson's medical records at Tr. 28-29 and 31-37. Relevant medical records are discussed as part of the analysis.

### IV. Standards

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); see also Brantley v. Colvin, 2013 WL 4007441, at *2 (E.D. Mo. Aug. 2, 2013). The impairment must be "of such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work." 42 U.S.C. § 1382c(a)(3)(B).

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920(a), 404.1520(a). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). First, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. §§ 416.920(a), 404.1520(a). Second, the claimant must have a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.920(c), 404.1520(c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Before considering step four, the ALJ must determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as "the most a claimant can do despite [her] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether the claimant can return to her past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f),

416.920(a)(4)(iv), 416.920(f); McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, she will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. Id.

At step five, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work in the national economy. 20 C.F.R. §§ 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, then she will be found to be disabled. 20 C.F.R. §§ 416.920(a)(4)(v), 404.1520(a)(4)(v). Through step four, the burden remains with the claimant to prove that she is disabled. Brantley, 2013 WL 4007441, at *3 (citation omitted). At step five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Id. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Meyerpeter v. Astrue, 902 F. Supp. 2d 1219, 1229 (E.D. Mo. 2012) (citations omitted).

The Court's role on judicial review is to determine whether the ALJ's findings are supported by substantial evidence in the record as a whole. Pate–Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision. Andrews v. Colvin, 791 F.3d 978, 983 (8th Cir. 2015); Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the Court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

**V.    Discussion**

In her appeal of the Commissioner's decision, Anderson argues that the ALJ erred by failing to address her fibromyalgia. She also asserts that the ALJ's RFC determination is not supported by substantial evidence because the ALJ gave little weight to the opinion of her treating physician, Dr. Leonard Lucas, D.O., based on the erroneous belief that he had treated her only once (Docs. 14, 25). In response, the Commissioner urges affirmance, arguing that the ALJ properly considered all of Anderson's severe impairments and properly evaluated her subjective symptoms. The Commissioner further argues that the ALJ permissibly gave Dr. Lucas's opinion little weight notwithstanding the fact that the ALJ's decision appears to be based, in part, on a mistaken understanding that Dr. Lucas had only treated Anderson on a single occasion (Doc. 24).

**Medical Evidence**

Dr. Lucas started treating Anderson on March 12, 2013 (Tr. 771-774, 868-875). At that time, Anderson reported esophageal reflux, migraines, abdomen pain, and "total body arthritis" (Tr. 868). During his examination of Anderson's back, Dr. Lucas observed "limited range of

motion" and "pain with motion" (Tr. 872). His neurological exam revealed no focal findings or movement disorder, intact cranial nerves, normal and symmetric deep tendon reflexes ("DTRs"), normal muscle tone, no tremors, and 5/5 strength (Id.). Dr. Lucas diagnosed Anderson with migraines, osteoarthritis of the neck, GERD, depression, and abdominal pain; and prescribed her, inter alia, Ultram, and Wellbutrin (Tr. 869-871). He also discontinued Anderson's previous prescriptions for Vicodin, Norco, and Tylenol (Tr. 873).

Anderson saw Dr. Lucas again on April 9, 2013, for follow-up in relation to her arthritis and migraine treatment and also complaining of knee pain (Tr. 859-867). Dr. Lucas noted that Anderson's neck was supple with no significant adenopathy or bruits, and had "about 50%" range of motion (Tr. 861). She also had limited range of motion in her back, and reported pain with motion during the exam (Id.). Anderson reported bilateral patellar pain and patellar grinding; Dr. Lucas noted that her ligaments and cartilage were "ok" and referred her "to orthopedics" (Tr. 861-862). He recommended that Anderson exercise in a pool and that she avoid bicycling and running (Tr. 862).

During an April 17, 2013 consultation, Dr. Thomas Fox, an orthopedic surgeon, observed that Anderson stood with no angular deformity, walked without a limp, had mild patellofemoral crepitus, and had questionable small fluid wave in both knees, good motion through her hips without pain, no peripheral edema or weakness (Tr. 856-857). Dr. Fox also noted that Anderson had excellent range of motion in both knees, but that she had pain with maximal flexion (Tr. 857). X-rays of Anderson's knees revealed bilateral degenerative joint disease and possible internal derangement (Tr. 857). Dr. Fox recommended an MRI, noting that he suspected Anderson's knee pain was the result of "underlying patellofemoral degeneration" (Tr. 856-857).

During a May 7, 2013 appointment with Dr. Lucas, Anderson reported neck pain, and Dr. Lucas again observed that her neck was supple with no significant adenopathy or bruits, and she had "about 50%" range of motion (Tr. 847-855). Dr. Lucas refilled Anderson's Ultram prescription and additionally prescribed her Zanaflex, a muscle relaxer (Tr. 850).

During a June 13, 2013 follow-up appointment with Dr. Lucas, Anderson reported back pain, describing it as "sharp shooting pain down the back of the left leg" (Tr. 836). According to Anderson, her back pain was a chronic injury that had recently "flared up" (Id.). Dr. Lucas noted that Anderson had limited range of motion in her back, pain with motion in her back during his exam, tenderness in her left anterior innominate, and spasms (Tr. 838). She was alert, oriented, had normal speech, no movement disorder, normal and symmetric DTRs, normal muscle tone, no tremors, and 5/5 strength (Id.). Dr. Lucas diagnosed somatic dysfunction of the lumbo-sacral area, performed osteopathic manipulation of Anderson's lumbar region, and prescribed her Norco (Tr. 839-840). During a July 9, 2013 follow-up exam, Dr. Lucas and Anderson discussed discontinuing her Depakote, a medication her psychiatrist had previously prescribed (Tr. 829-835). On August 6, 2013, Anderson followed up with Dr. Lucas regarding treatment for her migraines (Tr. 820-828); Dr. Lucas noted that Anderson had pain in her "mid to upper back and spasms in [her] upper T spine" (Tr. 823).

During a September 26, 2013 appointment, Anderson again reported back pain (Tr. 812). Dr. Lucas noted that Anderson had "pain in [her] mid to upper back and spasms in upper T spine," and pain in her left trochanteric area and anterior hip (Tr. 814). Dr. Lucas diagnosed somatic dysfunction of the lumbo-sacral area, performed osteopathic manipulation of Anderson's lumbar region, and refilled her prescriptions for Norco and Ultram (Tr. 814-815).

On November 4, 2013, Anderson presented to Dr. Lucas, complaining of back and elbow pain (Tr. 803-810). Dr. Lucas diagnosed ulnar nerve entrapment, neuropathy, degeneration of lumbar and lumbosacral intervertebral disc, and radicular syndrome of her lower limbs (Tr. 805). During a January 23, 2014 follow-up appointment, Anderson and Dr. Lucas discussed pain management for her neck pain, a possible referral to an ENT specialist for her migraines, and medication refills (Tr. 791-799). Dr. Lucas also noted that Anderson had some symptoms that were compatible with fibromyalgia, and refilled her Norco prescription (Tr. 795-796).

On January 29, 2014, Anderson visited Dr. Fox, who reviewed her recent MRI and noted that it showed "a lot of degenerative changes through the medial meniscus" but did not definitely show whether her meniscus was torn (Tr. 789). Dr. Fox opined that Anderson had fairly good patellofemoral joint space, but that she had "a lot of subchondral cyst along the patella" (Id.). Dr. Fox did not recommend surgery or cortisone injections, but instead encouraged Anderson to exercise and participate in physical therapy (Tr. 790).

During a March 3, 2014 appointment with Dr. Lucas, Anderson requested refills of her pain medications, and complained of head and nasal congestion and daily headaches (Tr. 776-785). Dr. Lucas again noted that Anderson had "pain in [her] mid to upper back and spasms in upper T spine," and pain in her left trochanteric area and anterior hip (Tr. 780). Her neck was supple with no significant adenopathy, carotids, or bruits. Dr. Lucas refilled Anderson's Norco prescription (Id.).

Also on March 3, 2014, Dr. Lucas completed a Residual Function Capacity Questionnaire (Tr. 729-730). Although his handwriting is difficult to read, it appears Dr. Lucas noted that he had diagnosed Anderson with arthritis in her neck, disc disease, and bipolar disorder (Tr. 729). Dr. Lucas stated that Anderson had a fair to poor prognosis (Id.). In response

to the question of how often the symptoms associated with Anderson's impairments were severe enough to interfere with the attention and concentration required to perform simple work-related tasks, Dr. Lucas checked the box indicating "Often." (Id.) In response to a question whether Anderson would "need to recline or lie down during a hypothetical 8-hour workday in excess of the typical 15-minute break in the morning, the 30-60 minute lunch, and the typical 15-minute break in the afternoon," Dr. Lucas checked the box indicating "Yes" (Id.). Dr. Lucas also opined that Anderson could sit for 30 minutes at a time, could "stand/walk" for 20 minutes at a time, could sit for 4 hours per 8-hour workday, and could "stand/walk" for 3 hours per 8 hour workday (Id.). He also opined that Anderson would need a job that permitted her to shift positions at will from sitting, standing, or walking; and that she would require unscheduled breaks during a typical 8-hour workday (Id.). According to Dr. Lucas, Anderson could frequently lift less than 10 pounds, occasionally lift 10 pounds, and never lift 20 or more pounds (Tr. 730). It was Dr. Lucas's opinion that Anderson also had limitations in performing repetitive reaching, handling, and fingering; and that she would likely be absent from work more than four times per month as a result of her impairments or treatments (Id.). Dr. Lucas indicated that Anderson was not malingering, that her impairments were reasonably consistent with her symptoms and functional limitations, and that she was not physically capable of working an 8 hour day, 5 days per week on a sustained basis (Id.).

Dr. Lucas also completed a Mental Capacity Assessment on March 3, 2014 (Tr. 732-734). He indicated that Anderson had "moderate" impairments in her ability to understand and remember detailed instructions, ability to maintain attention and concentration for extended periods, and ability to work in coordination with or in close proximity to others without being distracted by them (Tr. 732-733). Dr. Lucas also stated that Anderson had "marked" impairment

in her ability to accept instructions and respond appropriately to criticism from supervisors (Tr. 733). He further indicated that Anderson had "extreme" impairments in her ability to perform activities within a schedule, to maintain regular attendance, and to be punctual within customary tolerances; her ability to make simple work-related decisions; and her ability to perform at a consistent pace with a standard number and length of rest periods (Tr. 732-733). Dr. Lucas specifically noted that Anderson had back and arthritis pain, and that she does not handle criticism well, as she "breaks down" (Tr. 733).

The ALJ gave Dr. Lucas's opinions little weight (Tr. 35-36). Specifically, the ALJ discounted Dr. Lucas's opinion in the Residual Function Capacity Questionnaire as follows:

> The [ALJ] gives little weight to the opinion by Dr. Lucas because this physician only saw [Anderson] once. The documented claimant symptoms in the treatment records are not consistent with those noted in the medical source statement. For example, on the date [Anderson] tendered the forms to Dr. Lucas which he filled out as his medical source statement on March 3, 2014, the examination of [Anderson] was normal. He made no diagnosis then or at any other time that would limit [Anderson's] capacity. The limitations expressed in the medical source statement are dramatically more limiting than noted in the treatment records and Dr. Lucas does not explain this disparity.
>
> Additionally, [Anderson's] September 26, 2013 records state her spinal complaints were "subjective" and due to a "somatic dysfunction." These observations are inconsistent with the limitations expressed by Dr. Lucas in the medical source statement. As a result, little weight is given to that opinion.

(Tr. 35).

In contrast, the ALJ gave significant weight to the opinion of Dr. Mila Bacalla, M.D., a non-examining, independent physician who offered an opinion based on her review of Anderson's medical records, at the behest of the state agency (Tr. 35, 412). In her March 6, 2013 report, Dr. Bacalla opined as follows:

> [Anderson] alleges disability due to arthritis, carpal tunnel syndrome, neck, back, hips, knee and had pain with an [alleged onset date] on 9/1/02.

> MER shows [Anderson] has history of bilateral carpal tunnel releases. She has chronic pain in the neck, back, knees, hips and hands. She has history of headaches some of the described headaches were suggestive of migraines. These occur frequently but controlled with medications. [Anderson] has no intractable headaches that required frequent ER visit or hospitalization. [Anderson] was admitted from 11/11/11 to 11/12/11 for alcohol problem. PE at that time showed no abnormal findings including neuro examination. [Anderson] could walk tandem and Romberg was negative.
>
> Report dated 8/27/12 showed BMI of 27.7. BP was normal. There was less suppleness of the neck with crepitus. There was pain with motion of the knees and crepitus bilaterally. Neuro was normal. Coordination was normal. Gait and balance were normal. Another examination on 8/28/12 was normal. Xrays of the knees showed mild irregularity of posterior surface of patella and mild to moderate narrowing of medial compartment. [Anderson was seen in ER on 9/3/12 for chronic neck pain, back pain, HTN, palpitations and migraines. She ran out of medications. Examination showed tenderness over the neck with normal range of motion. M/S showed normal range of motion. Rest of examination was unremarkable.
>
> The evidence in file does not support meeting/equal listing severity. Objective evidence support the RFC in file. Allegations are attributable to the [medically determinable impairments]. Intensity of limitations noted in the [activities of daily living] is out of proportion to the objective evidence. Her statement is considered partially credible.

(Tr. 412). The ALJ gave Dr. Bacalla's opinion significant weight, finding that it was consistent with the symptoms observed in Anderson's treatment records (Tr. 35).

A treating physician's opinion is generally entitled to substantial weight but does not automatically control. Brown v. Astrue, 611 F.3d 941, 951-52 (8th Cir. 2010) (quoting Heino v. Astrue, 578 F.3d 873, 880 (8th Cir.2009) (internal quotations and citation omitted). "An ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." Id. "Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's

evaluation." Andrews v. Colvin, No. 4:13-cv-1033-NAB, 2014 WL 2968815, at *2 (E.D. Mo. July 1, 2014) (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir.2000)).

Upon review of the record, the Court concludes that the ALJ did not give adequate consideration to Dr. Lucas's opinion. Initially, it appears that the ALJ overlooked the fact that Dr. Lucas had treated Anderson on ten occasions over the course of a full year before he offered his opinion in this case. See Nishke v. Astrue, 878 F. Supp. 2d 958, 982 (E.D. Mo. 2012) (citing Casey v. Astrue, 503 F.3d 687, 692 (8th Cir. 2007)) (when deciding how much weight to give a treating physician's opinion, an ALJ must consider the length of the treatment relationship and the frequency of examinations). Moreover, as summarized above and contrary to the ALJ's finding that Dr. Lucas's opinion was inconsistent with his March 3, 2014 treatment notes, Dr. Lucas's diagnoses and treatments, considered in their entirety, appear to be consistent with at least some of the limitations he listed in his March 3, 2014 reports.[2] See Fessenden v. Astrue, No. 2:10cv31DDN, 2011 WL 3665130, at *9 (E.D. Mo. Aug. 22, 2011) (citing 20 C.F.R. § 404.1527(d)(2)) (the ALJ must assess the record as a whole to determine whether the treating physicians' opinions are inconsistent with other substantial evidence in the record).

In light of this oversight, the Court cannot conclude that the ALJ provided good reasons for his reason to discredit Dr. Lucas's opinion. See Andrews, 2014 WL 2968815, at *2. As such,

---

[2] It also appears that the ALJ may have mistaken Dr. Lucas's diagnosis of "somatic dysfunction of the lumbo-sacral area," which is commonly treated with osteopathic manipulation, for "somatic symptoms," which are associated with unrelated psychological conditions. Compare Heathman v. Colvin, No. 2:13CV61 TIA, 2014 WL 4450462, at *6 n.1 (E.D. Mo. Sept. 10, 2014) (quoting American Ass'n of Colleges of Osteopathic Med., Glossary of Osteopathic Terminology 53 (rev. Nov. 2011)) ("'Somatic dysfunction' is a term of art used in the field of osteopathy and is defined as the '[i]mpaired or altered function of related components of the somatic (body framework) system: skeletal, arthrodial and myofascial structures, and their related vascular, lymphatic, and neural elements.' Somatic dysfunction is treatable using osteopathic manipulative treatment."), with Lomax v. Colvin, No. 4:12cv1275 TCM, 2013 WL 5442776, at *18-19 (E.D. Mo. Sept. 30, 2013) (discussing somatic complaints); see also Martsolf v. Colvin, No. 6:16-cv-00348-NKL, 2017 WL 77424, at *6 (W.D. Mo. Jan. 9, 2017).

16

the Court concludes that the ALJ's decision to discount Dr. Lucas's opinion is not supported by substantial evidence on the record as a whole. See Krogmeier, 294 F.3d at 1022 (substantial-evidence standard of review). The Court may not independently evaluate Dr. Lucas's opinion. See Howe v. Astrue, 499 F.3d 835, 839 (8th Cir. 2007) ("[I]t is not the role of this court to reweigh the evidence presented to the ALJ or to try the issue[s] de novo."). Therefore, the Court will remand this matter to the Commissioner to more fully consider Dr. Lucas's opinion and to reevaluate the relative merits of the opinions of Dr. Lucas and Dr. Batalla. See Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006) ("It is the ALJ's duty to resolve conflicts in the evidence."); see also Brown, 611 F.3d at 951-52 (an ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence); Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000) (when a one-time consultant disputes a treating physician's opinion, the ALJ must resolve the conflict between the opinions; a report of a one-time consultative examiner generally does not constitute substantial evidence, especially when contradicted by the claimant's treating physician).

## VI. Conclusion

The Court thus finds that there is not substantial evidence in the record to support the ALJ's decision. This case must, therefore, be remanded. On remand, the ALJ is directed to further develop the record, including additional consideration and evaluation of Dr. Lucas's opinion. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED AND REMANDED** to the Commissioner for further consideration in accordance with this Memorandum and Order.

Dated this 31st day of March, 2017.

                                                                          **JOHN A. ROSS**
                                                                          **UNITED STATES DISTRICT JUDGE**